Filed 1/10/14  In re L.P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.P. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,  Plaintiff and Respondent,  v.  SANDRA F.,  Defendant and Appellant. | F067621  (Super. Ct. Nos. 515849, 515850, 515851)  **OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Poochigian, Acting P.J., Detjen, J. and Peña, J.

Sandra F. appeals the juvenile court's orders terminating her parental rights to her nine-year-old son I.P., seven-year-old daughter A.P. and six-year-old son M.P. (Welf. & Inst. Code, § 366.26).[1] Sandra contends there is insufficient evidence her children are adoptable. We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

In December 2010, the juvenile court exercised its dependency jurisdiction over then six-year-old I.P., four-year-old A.P. and three-year-old M.P. (the children) after sustaining allegations that their father, Joseph, sexually molested their 11-year-old half-sister, and Sandra knew but failed to act. The court ordered Sandra and Joseph to participate in reunification services.

The Stanislaus County Community Services Agency (agency) placed the children together in foster care upon their initial removal in August 2010. They were first placed in a receiving home for one day and then placed in the foster home of Mr. and Mrs. B., who initially were willing to serve as a concurrent placement. However, Mr. and Mrs. B. subsequently declined to do so, and in December 2010, the agency moved the children to the concurrent foster home of Ms. L. In March 2011, the juvenile court appointed a court-appointed special advocate (CASA) for the children.

In its report, prepared for the six-month review hearing, the agency informed the juvenile court the children were all developmentally on target and did not need mental health counseling. Sandra visited them regularly under the supervision of a therapist, who reported the visits were appropriate and loving. However, Sandra resisted participating in sexual abuse counseling and being assessed for medication.

In April 2011, the juvenile court continued Sandra's reunification services to the 12-month review hearing, which it set for October 2011.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Meanwhile, the children were removed from Ms. L. because she could not accommodate separate bedrooms for then four-year-old M.P. and his five-year-old sister A.P., as required by law. Ms. L. decided she no longer wanted to maintain her concurrent home status so, in August 2011, the agency placed the children in the concurrent home of Mr. and Mrs. A., who expressed a commitment to providing a permanent home for all three children.

In its report for the 12-month review hearing, the agency reported the children continued to progress. The only new development concerned then seven-year-old I.P., who was exhibiting behavior suggestive of Attention Deficit Hyperactivity Disorder (ADHD), including hyperactivity, inattention, impulsiveness, destruction of property, distraction and aggression. He began individual therapy and participated in an ADHD camp and his behavior quickly improved.

The agency also reported Sandra continued to regularly visit the children under supervision and her interaction with them appeared loving. However, she remained resistant to her court-ordered services and Joseph had not participated in his services since the six-month review hearing. In addition, Mr. and Mrs. A. wanted to adopt all three children. Consequently, the agency recommended the juvenile court terminate Sandra and Joseph's reunification services.

In December 2011, the juvenile court conducted a contested 12-month review hearing and terminated Joseph's reunification services. The court, however, continued services for Sandra to the 18-month review hearing, which the court set for May 2012, and ordered the agency to modify her case plan.

In February 2012, the children were removed from Mr. and Mrs. A.'s home because Mrs. A.'s adult brother was allegedly physically abusive. They were placed with their maternal aunt Christina, her husband and their three sons, aged 14, 12 and 8. Initially, the children settled well into the home and appeared to be happy. However, I.P. began to exhibit behavioral problems such as defiance, lying, hitting and choking. He hit

3

his uncle in the face when his uncle attempted to discipline him and I.P. choked his eight-year-old cousin. M.P. was also starting to become defiant. The CASA believed some of the children's defiance stemmed from promises Sandra made to them that she was building a new home for them and they would be living with her soon. The CASA recommended the children participate in counseling to help them cope with their loss and many life changes. The CASA also recommended a higher level of care if their behavioral issues continued.

In May 2012, the agency filed its report for the 18-month review hearing. It recommended that the juvenile court terminate Sandra's reunification services. Sandra did not accept that Joseph molested her daughter, blamed everyone else for her problems, and was resistant to treatment. The agency was very concerned that Sandra would not protect her children from further abuse or neglect.

The agency also recommended the juvenile court implement a permanent plan of adoption for the children. The agency reported Christina and her husband loved the children but were overwhelmed by I.P.'s aggressive behavior and wanted him to stabilize before they fully committed to adoption.

Just days after the agency filed its report, Christina called the emergency on-call social worker and asked to have the children removed from her home. She explained that her eight-year-old son was lying on the floor watching television when A.P. jumped full force on his stomach, causing vomiting and pain. He was taken to the emergency room where he remained overnight. Christina said her son was so afraid of I.P. and A.P. that he insisted on sleeping with her and her husband at night. She was very worried for her son's safety and wanted the children removed as soon as possible. The CASA recommended the children be placed in a home where they would receive more individual attention. On May 31, 2012, the agency placed the children in the home of Mr. and Mrs. M.

In August 2012, following a contested 18-month review hearing, the juvenile court terminated Sandra's reunification services and set a section 366.26 hearing.[2]

In its report for the section 366.26 hearing, the agency recommended the juvenile court terminate Sandra's parental rights and establish a permanent plan of adoption. The social worker who prepared the report stated she was confident the children would be adopted by Mr. and Mrs. M., if Sandra's parental rights were terminated. However, she also reported that Mr. and Mrs. M. expressed serious concerns in November about M.P.'s defiance; inability to be toilet trained and sexualized behavior. They said they would be willing to adopt I.P. and A.P. but preferred legal guardianship over M.P. or legal guardianship over all three with the possibility of adoption. A month later, however, they affirmed their desire to adopt all three children.

In December 2012, the CASA filed her report. She said the children had adjusted well in Mr. and Mrs. M.'s home and she believed it was their best placement to date. The children responded to their structured environment and discipline. M.P., however, was acting out at school, refusing to follow the teacher's directions, urinating on the wall of the classroom bathroom and destroying crayons and paper. The teacher separated him from his peer group and his behavior improved.

The CASA also reported the children were receiving individual counseling and were average to above average in cognitive and language skills. Their visits with Sandra were reduced to one monthly visit and A.P. and M.P. did not show any adverse emotional reaction to visiting her. However, I.P. cried during Thanksgiving week, saying he missed his mother. The CASA concurred that Sandra's parental rights should be terminated and the children adopted.

---

**2**     Sandra challenged the juvenile court's orders terminating her reunification services and setting a section 366.26 hearing by writ petition (Cal. Rules of Court, rules 8.450-8.452), which we denied (F065720).

Also in December 2012, I.P. was diagnosed with ADHD, as well as adjustment disorder with anxious and depressed mood. His physician stated he had become more anxious and sad since the frequency of his visits decreased. The physician believed his symptoms were likely to worsen as the time approached for visits to end and requested court approval for psychotropic medication, which the juvenile court granted.

In February 2012, the children were removed from Mr. and Mrs. M. because, according to the agency, Mrs. M. determined she could no longer provide an adoptive home and it was not a "good fit." The children were placed with Mr. and Mrs. A. (not the previous foster couple) and their two biological children, a three-year-old son and a two-year-old daughter. The CASA reported that I.P. continued to have problems with distractibility but functioned well in the home and accepted the family rules. He was maintaining average to above average grades in school and there was a marked improvement in his attention span attributable to his medication. The CASA also reported that A.P. was maintaining above average grades and made friends easily. She and I.P. completed their counseling goals and were no longer attending. M.P. continued to attend counseling. He was somewhat inattentive in school and mischievous but adjusted to his new classroom and was academically capable.

The CASA was very pleased to see the children make so much progress in so little time. She stated the children appeared to be treated with appropriate discipline, care and affection. The home was busy and stimulating and the foster parents appeared involved and interested in seeing the children progress. The CASA affirmed her opinion that Sandra's parental rights should be terminated and the children adopted.

In an addendum report, the agency informed the juvenile court that Mr. and Mrs. A. were committed to adopting the children and the children reported positive feelings toward them. I.P. stated he wanted them to adopt him. Mr. and Mrs. A. had demonstrated a strong willingness to work with the children and their needs.

6

The section 366.26 hearing was continued and conducted in June 2013. Prior to the hearing, the CASA submitted an updated report on the children's status. They continued to perform well scholastically and I.P. was one of the top performers in his class. In June, the children participated in a bonding study, which upset A.P. and I.P. A.P. cried the night before and expressed fear of being taken away. I.P. vomited in the social worker's car on the way to participate in the study. He subsequently asked for "something to remember [his] mother by."

Sandra's position at the section 366.26 hearing was that the agency failed to show the children were adoptable, focusing the juvenile court's attention on the many changes in placement. To that end, Sandra's attorney asked the agency to list the children's placements as an offer of proof. The social worker described each placement by the dates the children were placed and removed and the reason for the change in placement. The offer of proof was accepted by all parties. Sandra's attorney asked the court to order the children into long-term foster care and reevaluate their status in six months.

Following argument, the juvenile court found by clear and convincing evidence that it was very likely the children would be adopted and that terminating Sandra's parental rights would not be detrimental to them. The court ordered adoption as the appropriate permanent plan and terminated Sandra and Joseph's parental rights. This appeal ensued.

## DISCUSSION

Sandra contends the evidence is insufficient to support a finding that the children are adoptable. Specifically, she contends the children are neither "generally" nor "specifically" adoptable; a distinction used by appellate courts in reviewing adoptability findings. (E.g., *In re Brandon T*. (2008) 164 Cal.App.4th 1400, 1408 (*Brandon T*.).) Sandra argues the juvenile court could not find the children to be generally adoptable because they had "significant behavioral problems" and the prospect that Mr. and Mrs. A. would adopt them was speculative. Sandra argues this latter point, as well as the short

7

time the children were with Mr. and Mrs. A., as reasons the juvenile court could not find the children to be specifically adoptable.

In order to terminate parental rights, the juvenile court must find by clear and convincing evidence the child is likely to be adopted. (§ 366.26, subd. (c)(1).) In determining adoptability, the court's focus is on whether the child's age, physical condition and emotional state will create difficulty in locating a family willing to adopt. (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M*.).) "To be considered adoptable, a minor need not be in a prospective adoptive home and there need not be a prospective adoptive parent '"waiting in the wings."' [Citation.]" (*In re R.C*. (2008) 169 Cal.App.4th 486, 491 (*R.C*.).) Further, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted by the prospective adoptive parent or by some other family. (*Sarah M*., *supra*, 22 Cal.App.4th at pp. 1649-1650.)

A child who is not considered "generally" adoptable because of his or her age, poor physical health, physical disability, or emotional instability may nonetheless be adoptable because a specific prospective adoptive parent has been identified as willing to adopt the child. (*Sarah M*., *supra*, 22 Cal.App.4th at p. 1650.) In such cases, the court may determine the minor is "specifically adoptable" as opposed to "generally adoptable." (*Brandon T., supra,* 164 Cal.App.4th at p. 1408.) In specific adoptability cases, "the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child." (*In re Helen W*. (2007) 150 Cal.App.4th 71, 80.)

We review the juvenile court's order terminating parental rights for substantial evidence. This means we determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, a factual basis for termination. (*In re Lukas B*. (2000) 79 Cal.App.4th 1145, 1154.) In making this determination, we must "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of

8

every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) We may not reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Jamie R*. (2001) 90 Cal.App.4th 766, 774.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*R.C.*, *supra*, 169 Cal.App.4th at p. 491.)

In this case, there is substantial evidence the children are generally adoptable. They are healthy and perform well academically. Their behavior, though challenging, is not out of the norm given their circumstances. As the juvenile court stated "I don't see any evidence that these children have any particular issues that other children don't have. Many children have [Attention Deficit Disorder]. And a lot of times enuresis, encopresis, and those type[s] of issues can be just because there is so much disruption." Further, the children responded favorably to interventions to improve their behavior. Finally, the fact that the agency was able to place the children so quickly following each removal, despite their behavior, indicates that they are generally adoptable.

Sandra's contention that Mr. and Mrs. A.'s willingness to adopt is too speculative to support a finding of general adoptability fails for several reasons. First, a child does not have to be in a prospective adoptive home to be adoptable. There is sufficient evidence these children are adoptable without consideration of the A.'s willingness to adopt for all of the reasons we discussed above. Further, Sandra's focus on Mr. and Mrs. A.'s willingness to adopt apart from the qualities that make the children adoptable relates to specific adoptability, which is not germane. Where, as here, children are "adoptable based on factors in addition to a caregiver's willingness to adopt, the suitability or availability of the caregiver to adopt is not a relevant inquiry. [Citations.] Rather, a caregiver's willingness to adopt serves as further evidence the minor is likely to be adopted within a reasonable time either by the caregiver 'or by some other family.' [Citation.]" (*R.C.*, *supra*, 169 Cal.App.4th at pp. 493-494.) Finally, the cases on which

9

Sandra relies, *In re B.D.* (2008) 159 Cal.App.4th 1218 (*B.D.*) and *In re Asia L.* (2003) 107 Cal.App.4th 498 (*Asia L.*), are factually distinguishable.

In *B.D.*, the appellate court found insufficient evidence to support a finding of adoptability because the one family interested in adopting a sibling group of five did not have a foster care license, a preliminary assessment had not been performed and the children did not have a relationship with the prospective adoptive family. (*B.D.*, *supra*, 159 Cal.App.4th at pp. 1233-1234.) There are no such impediments here.

In *Asia L.*, the dependent children had emotional and behavioral problems serious enough to make them difficult to place for adoption. Notably, they were not in an adoptive placement. At best, their foster parents were willing to "explore the option of adopti[on]." The *Asia L.* court considered such evidence "too vague" to support an adoptability finding. (*Asia L., supra,* 107 Cal.App.4th at p. 512.) Here, the children were placed with prospective parents wanting to adopt.

We find no error.

## DISPOSITION

The orders terminating parental rights are affirmed.